**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MATTHEW GOLUB, derivatively on behalf of MAXAR TECHNOLOGIES INC., | |
| Plaintiff, | **C.A. No.** |
| vs. | |
| HOWARD L. LANCE, ANIL WIRASEKARA, DANIEL L. JABLONSKY, DENNIS CHOOKASZIAN, NICK S. CYPRUS, HOWELL M. ESTES III, LORI B. GARVER, JOANNE O. ISHAM, C. ROBERT KEHLER, BRIAN G. KENNING, L. ROGER MASON, JR., ROBERT L. PHILLIPS, and ERIC J. ZAHLER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| MAXAR TECHNOLOGIES INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Matthew Golub ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Maxar Technologies Inc. ("Maxar" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Howard L. Lance, Anil Wirasekara, Daniel L. Jablonsky, Dennis Chookaszian, Nick S. Cyprus, Howell M. Estes III, Lori B. Garver, Joanne O. Isham, C. Robert Kehler, Brian G. Kenning, L. Roger Mason, Jr., Robert L. Phillips, and Eric J. Zahler (collectively, the "Individual Defendants," and together with Maxar, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Maxar,

1

unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Maxar, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Maxar's directors and officers from March 26, 2018 through January 6, 2019, both dates inclusive (the "Relevant Period").

2.     Maxar is a Colorado-based provider of space infrastructure and communications technology. Through its subsidiary, Space Systems/Loral ("SSL"), the Company manufactures and operates geostationary communications ("GeoComm") satellites, which provide communications services and geospatial data to customers in the government and in the private sector. Among the Company's key satellites is WorldView-4, an imaging satellite obtained by the Company through its October 2017 acquisition of DigitalGlobe, an operator of remote sensing spacecraft and satellites.

3.     Over the course of the past several years, demand has shifted away from GeoComm satellites in favor of less expensive low-earth orbit ("LEO") satellites, causing a significant decline

in the GeoComm market. Accordingly, the Company's business declined as well, with SSL procuring only two GeoComm contracts during 2017. Yet, despite conceding that the decline in the GeoComm market had negatively affected the Company's business, during the Relevant Period, the Individual Defendants began systematically understating the true extent of the negative impact on the Company's financial results, including by failing to record necessary impairments to Maxar's assets and inventory.

4.    At the start of the Relevant Period, on March 26, 2018, the Company issued a press release announcing that it had secured a contract to construct a GeoComm satellite—AMOS-8— for Space Communication Ltd. ("Spacecom"), an Israeli space technology company. Though the Individual Defendants repeatedly touted this contract to the public, in reality, the contract was not effective until SSL received its first payment from Spacecom. Moreover, Spacecom could—and ultimately did—withdraw from the contract within 60 days without penalty.

5.    On August 7, 2018, Spruce Point Capital Management, an investment management and forensic research firm, published a blistering report on its website (the "Spruce Point Report") alleging that the Individual Defendants had engaged in improper accounting practices to conceal significant, material impairments of the Company's intangible assets related to declines in the Company's GeoComm business.[1] Among other things, the Spruce Point Report claimed that "Maxar's balance sheet is inflated with goodwill and overcapitalized intangible assets," and estimated that the Company's intangible assets were impaired by hundreds of millions of dollars.

---

[1]    https://www.sprucepointcap.com/reports/maxr_research_thesis_8-7-2018.pdf    (last    visited September 16, 2020).

6.      On this news, the price of the Company's stock fell on heavy trading volume from $44.41 per share at the close of trading on August 6, 2018, to $38.44 per share at the close of trading on August 7, 2018, representing a loss in value of over 13%.

7.      Though the Individual Defendants quickly issued a statement dismissing the allegations in the Spruce Point Report, only a few weeks later, on August 24, 2018, the Company issued a press release disclosing that after an investigation by Maxar's Audit Committee, the Audit Committee had determined that an asset impairment charge was indeed necessary. On this disclosure, the price of the Company's stock fell by another 5.6% over the next two trading days, dropping from $35.92 per share at the close of trading on August 22, 2018, to $33.92 at the close of trading on August 24, 2018.

8.      Then, on September 3, 2018, after Spacecom had declined to make its down payment to SSL in connection with the AMOS-8 contract, the Israeli Ministry of Science and Technology announced that due to the Israeli government's preference for an Israeli manufacturer to build AMOS-8, AMOS-8 would be constructed in Israel and funded by the Israeli government.

9.      On this news, the price of the Company's stock fell on heavy trading volume from $31.05 per share at the close of trading on August 31, 2018, the prior trading day, to $29.34 per share at the close of trading on September 4, 2018, representing a loss in value of nearly 6%.

10.     On September 25, 2018, Spacecom confirmed in a filing with the Tel Aviv Stock Exchange that it would not be making any down payment in connection with the AMOS-8 contract. On this news, the price of the Company's stock declined again from $34.81 per share at the close of trading on September 25, 2018, to $33.18 per share at the close of trading on September 26, 2018, representing a loss in value of nearly 5%.

11.     On or about October 12, 2018, the Company received data from its WorldView-4 satellite showing that the satellite had experienced a permanent loss of stability, and could therefore no longer produce high quality images—the satellite's sole revenue-generating function. Yet, the Individual Defendants concealed this disastrous news from the public, and instead affirmed to the public that the satellite remained viable.

12.     On October 31, 2018, the Company issued a press release that belatedly revealed a whopping $37.7 million in impairment charges and $345.9 million in impairment losses in connection to the Company's GeoComm business. On this news, the price of the Company's stock plunged by almost 45% on heavy trading volume, falling from $27.07 per share at the close of trading on October 30, 2018, to $14.91 per share at the close of trading on October 31, 2018.

13.     Finally, on January 7, 2019, the Company at last disclosed that WorldView-4 could no longer produce usable high-quality imagery due to the satellite's loss of stability—facts that the Individual Defendants had been privy to for several months prior.

14.     On this news, the price of the Company's stock plummeted once again, falling from $11.72 per share at the close of trading on January 4, 2019, the prior trading day, to $8.03 per share at the close of trading on January 7, 2019, representing a loss in value of nearly 31%. The Company's stock price fell by an additional 25% over the course of the next trading day, sinking to $6.03 per share at the close of trading on January 8, 2019.

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in improper accounting practices, and by personally making and/or causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and

misleading statements that failed to disclose, *inter alia*, that: (1) the Individual Defendants improperly inflated the value of the Company's intangible assets related to the Company's GeoComm business, and omitted material impairments; (2) the Company's AMOS-8 contract with Spacecom was largely illusory, and would predictably fall through; (3) the Company's WorldView-4 satellite had become permanently unstable, and accordingly the satellite could no longer produce usable high-quality images; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

17.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

18.    In light of the Individual Defendants' misconduct, which has subjected the Company, its former President and Chief Executive Officer ("CEO"), and its former interim Chief Financial Officer ("CFO") to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of Colorado (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

19.     In the Securities Class Action, District Judge William J. Martinez granted in part and denied in part defendants Maxar, Howard L. Lance, and Anil Wirasekara's motion to dismiss on September 11, 2020. Though Judge Martinez dismissed without prejudice the claims relating to defendants' statements regarding the World-View-4 satellite and defendants' March 26, 2018 statements regarding the AMOS-8 contract, Judge Martinez found that defendants' statements regarding the Company's impairment—as well as the rest of defendants' statements regarding the AMOS-8 contract—constituted material misstatements or omissions. Securities Class Action Order at 39, *Oregon Laborers Employers Pension Trust Fund, et al. v. Maxar Technologies Inc., et al.*, Docket No. 1:19-cv-00124-WJM-SKC (D. Colo. September 11, 2020) ("Securities Class Action Order").

20.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Maxar's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of Maxar.  Plaintiff has continuously held Maxar common stock at all relevant times.

### Nominal Defendant Maxar

26.     Maxar is a Delaware corporation with its principal executive offices at 1300 W. 120th Avenue, Westminster Colorado 80234.  Maxar's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "MAXR."

### Defendant Lance

27.     Defendant Howard L. Lance ("Lance") served as the Company's President and CEO from May 2016 until he resigned effective January 13, 2019.

28.     For the fiscal year ended December 31, 2018, Defendant Lance received $2,214,029 in compensation from the Company. This included $1,013,462 in salary, $917,500 in non-equity incentive plan compensation, and $283,067 in all other compensation.

**Defendant Wirasekara**

29.     Defendant Anil Wirasekara ("Wirasekara") served as the Company's interim CFO from February 26, 2018 through August 15, 2018, and then as the Company's Executive Vice President, Finance from August 2018 until he retired on March 13, 2020. Previously, he served as the Company's CFO from 1996 through October 2017.

30.     For the fiscal year ended December 31, 2018, Defendant Wirasekara received $1,973,716 in compensation from the Company. This included $258,520 in salary, $109,412 in non-equity incentive plan compensation, $1,587,387 in change in pension value and nonqualified deferred compensation earnings, and $18,397 in all other compensation.

**Defendant Jablonsky**

31.     Defendant Daniel L. Jablonsky ("Jablonsky") has served as the Company's President and CEO since January 13, 2019. He previously served as the President of DigitalGlobe following its 2017 acquisition by the Company, until he was appointed as the Company's President and CEO in January 2019. According to the Company's Schedule 14A filed with the SEC on March 31, 2020 (the "2020 Proxy Statement"), as of March 19, 2020, Defendant Jablonsky beneficially owned 114,833 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $8.39, Defendant Jablonsky owned approximately $963,448 worth of Maxar stock.

32.     For the fiscal year ended December 31, 2019, Defendant Jablonsky received $3,954,024 in compensation from the Company. This included $684,424 in fees earned or paid in cash, $2,314,981 in stock awards, $909,300 in non-equity incentive plan compensation, and $45,319 in all other compensation.

33.     The Company's 2020 Proxy Statement stated the following about Defendant Jablonsky:

Mr. Jablonsky is our CEO and President. Mr. Jablonsky joined Maxar in 2017 after its acquisition of DigitalGlobe and served as President of DigitalGlobe until his appointment as Maxar's CEO in 2019. Prior to its acquisition, while at DigitalGlobe, Mr. Jablonsky served as Senior Vice President, General Counsel and Corporate Secretary from March 2012 until October 2017, and General Manager, International Defense & Intelligence. Prior to this, Mr. Jablonsky served as Senior Corporate Counsel, Securities and Mergers & Acquisitions and subsequently as the Interim Co-General Counsel of Flextronics International Ltd. Mr. Jablonsky previously was in-house counsel at UBS Financial Services, Inc., served in the enforcement division of the U.S. Securities and Exchange Commission, and practiced corporate and securities law with Brownstein Hyatt Farber Schreck, LLP and O'Melveny & Myers LLP. Mr. Jablonsky also served as a surface warfare officer and nuclear engineer in the United States Navy prior to attending law school. Mr. Jablonsky holds a B.S. in Mechanical Engineering from the United States Naval Academy and a Juris Doctor degree from the University of Washington School of Law.

**Defendant Chookaszian**

34.    Defendant Dennis Chookaszian ("Chookaszian") served as a Company director from 2005 until he resigned effective May 8, 2019.

35.    For the fiscal year ended December 31, 2018, Defendant Chookaszian received $166,973 in compensation from the Company. This included $90,080 in fees earned or paid in cash and $76,893 in stock awards.

**Defendant Cyprus**

36.    Defendant Nick S. Cyprus ("Cyprus") has served as a Company director since 2017. He also serves as the Chair of the Company's Audit and Finance Committee, and as a member of the Risk Committee. According to the 2020 Proxy Statement, as of March 19, 2020, Defendant Cyprus beneficially owned 19,911 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $8.39, Defendant Cyprus owned approximately $167,053 worth of Maxar stock.

37.    For the fiscal year ended December 31, 2018, Defendant Cyprus received $154,052 in compensation from the Company. This included $93,432 in fees earned or paid in cash and $60,620 in stock awards.

38.    The Company's 2020 Proxy Statement stated the following about Defendant Cyprus:

> Mr. Cyprus is a corporate director. Mr. Cyprus was previously Vice President, Controller and Chief Accounting Officer of General Motors Company, an automotive manufacturer, from December 2006 to July 2013. Prior to joining General Motors Company, Mr. Cyprus served in various senior executive roles at Interpublic Group of Companies and AT&T Corporation. Mr. Cyprus currently sits on the Board of Directors of Volt Information Sciences, Inc., and is the Chairman of its Audit Committee as well as a member of its Nominating and Corporate Governance Committee and Compensation Committee. Mr. Cyprus also sits on the Board of Directors of Trusted Media Brands, Inc. (f/k/a Reader's Digest Association, Inc.) and is the Chairman of its Audit Committee. He previously served as a director of DigitalGlobe, Inc. Mr. Cyprus holds a Master of Business Administration from New York University's Stern School of Business and a Bachelor of Science Degree in Accounting from Fairleigh Dickinson University in New Jersey.

**Defendant Estes**

39.    Defendant Howell M. Estes III ("Estes") has served as a Company director since 2017, and as the Chairman of the Board since 2019. According to the 2020 Proxy Statement, as of March 19, 2020, Defendant Estes beneficially owned 39,258 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $8.39, Defendant Estes owned approximately $329,374 worth of Maxar stock.

40.    For the fiscal year ended December 31, 2018, Defendant Estes received $140,640 in compensation from the Company. This included $80,020 in fees earned or paid in cash and $60,620 in stock awards.

41.    The Company's 2020 Proxy Statement stated the following about Defendant Estes:

> General Estes has been the President of Howell Estes & Associates, Inc., a consulting firm, since 1998. From 1965 to 1998, he served in the U.S. Air Force.

11

At the time of his retirement from the Air Force, he was Commander-in-Chief of the North American Aerospace Defense Command and the United States Space Command and also Commander of the Air Force Space Command. General Estes also serves on the Board of Directors of Analytical Graphics, Inc., a software development company focused on spaceflight and national security. He previously served as a director of DigitalGlobe, Inc. In addition to a Bachelor of Science Degree from the U.S. Air Force Academy, he holds a Master of Arts Degree in Public Administration from Auburn University and is a graduate of the Program for Senior Managers in Government at Harvard's JFK School of Government.

### Defendant Garver

42.     Defendant Lori B. Garver ("Garver") served as a Company director from 2015 until she resigned on October 2, 2019.

43.     For the fiscal year ended December 31, 2018, Defendant Garver received $153,557 in compensation from the Company. This included $90,080 in fees earned or paid in cash and $63,477 in stock awards.

44.     The Company's Schedule 14A filed with the SEC on March 28, 2019 (the "2019 Proxy Statement") stated the following about Defendant Estes:

Ms. Garver is currently the Chief Executive Officer of Earthrise, a project of the Windward Fund, a public charity that incubates and hosts initiatives that pursue solutions to environmental challenges. Prior to this position, Ms. Garver was the General Manager of the Air Line Pilots Association from September 2013 until January 2019. Ms. Garver also served as Deputy Administrator of the National Aeronautics and Space Administration (NASA) from 2009 to 2013. She previously worked at NASA from 1996 to 2001 within the Office of Policy and Plans, culminating in reporting directly to the NASA Administrator on NASA's policies and long range plans. Outside of NASA, Ms. Garver was Executive Director of the National Space Society for nine years and worked for Capital Space, LLC and DFI International as a Vice President. Ms. Garver is a Co-Founder and President of the Brooke Owens Fellowship. Ms. Garver holds a Bachelor's degree in Political Economy, from Colorado College and a Master's degree in Science, Technology and Public Policy from George Washington University.

### Defendant Isham

45.     Defendant Joanne O. Isham ("Isham") has served as a Company director since 2016. She also serves as a member of the Company's Compensation Committee and Risk

Committee. According to the 2020 Proxy Statement, as of March 19, 2020, Defendant Isham beneficially owned 1,000 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $8.39, Defendant Isham owned approximately $8,390 worth of Maxar stock.

46.     For the fiscal year ended December 31, 2018, Defendant Isham received $142,452 in compensation from the Company. This included $80,020 in fees earned or paid in cash and $62,432 in stock awards.

47.     The Company's 2020 Proxy Statement stated the following about Defendant Isham:

> Ms. Isham is President of Isham Associates LLC, a consulting firm.  She had a distinguished career as a Senior Executive in the U.S. Intelligence Community until her retirement in 2006. She held numerous leadership and senior policy positions, serving as Deputy Director, National Geospatial Intelligence Agency (NGA); Deputy Director, Science and Technology, Central Intelligence Agency (CIA); Director, Congressional Affairs, CIA; and Director, Legislative Affairs, National Reconnaissance Office (NRO). Subsequently, Ms. Isham held executive positions with BAE Systems, Inc., High Performance Technologies, Inc. and L-1 Identity Solutions, Inc. Ms. Isham holds a Bachelor of Arts degree in Government and International Studies from the University of Notre Dame.

**Defendant Kehler**

48.     Defendant C. Robert Kehler ("Kehler") has served as a Company director since 2016. He also serves as the Chair of the Company's Risk Committee, and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 19, 2020, Defendant Kehler beneficially owned 1,100 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $8.39, Defendant Kehler owned approximately $9,229 worth of Maxar stock.

49.     For the fiscal year ended December 31, 2018, Defendant Kehler received $152,452 in compensation from the Company. This included $90,020 in fees earned or paid in cash, $62,432 in stock awards, and $10,000 in all other compensation.

50.    The Company's 2020 Proxy Statement stated the following about Defendant Kehler:

> General Kehler is a corporate director. General Kehler had a distinguished military career with a deep focus on U.S. military space strategy and policy. He served as Commander, U.S. Strategic Command; Commander, Air Force Space Command; Deputy Commander, U.S. Strategic Command; Director, National Security Space Integration; and Commander, 21st Space Wing. General Kehler also serves as a director of Monocle Acquisition Corp., and is a member of their Audit Committee and Compensation Committee, and as a non-Executive Director of Inmarsat plc where he is a member of their Remuneration Committee. General Kehler is also a member of the Board of Trustees of MITRE Corporation. He joined the U.S. Air Force in 1975 as a Distinguished Graduate of the Pennsylvania State University R.O.T.C. program, has Master's degrees from the University of Oklahoma in Public Administration and from the Naval War College in National Security and Strategic Studies and has completed executive development programs at Carnegie-Mellon University, Syracuse University and Harvard University's JFK School of Government.

### Defendant Kenning

51.    Defendant Brian G. Kenning ("Kenning") served as a Company director from 2003 until he resigned effective May 8, 2019.

52.    For the fiscal year ended December 31, 2018, Defendant Kenning received $109,704 in compensation from the Company. This included $38,032 in fees earned or paid in cash and $71,672 in stock awards.

### Defendant Mason

53.    Defendant L. Roger Mason, Jr. ("Mason") has served as a Company director since 2017. He also serves as a member of the Company's Audit and Finance Committee and Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 19, 2020, Defendant Mason beneficially owned 7,835 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $8.39, Defendant Mason owned approximately $65,735 worth of Maxar stock.

54.     For the fiscal year ended December 31, 2018, Defendant Mason received $140,640 in compensation from the Company. This included $80,020 in fees earned or paid in cash and $60,620 in stock awards.

55.     The Company's 2020 Proxy Statement stated the following about Defendant Mason:

> Dr. Mason has been the President of Peraton's Space, Intelligence & Cyber sector since January 2018. Prior to joining Peraton, Dr. Mason was the Senior Vice President, Chief Security Officer of Noblis, a nonprofit science, technology, and strategy organization from January 2014 until December 2017. Prior to joining Noblis, from May 2009 to January 2014, Dr. Mason was the Assistant Director of National Intelligence for Systems and Resource Analyses (ADNI/SRA). Dr. Mason previously served as a director of DigitalGlobe, Inc. and as a director of the Intelligence and National Security Alliance, a 501(c)6 organization  Dr. Mason earned his doctorate and master's degrees in engineering physics (nuclear) from the University of Virginia, a master's degree in business administration from Northwestern University (Kellogg School), and a bachelor's degree in physics from The George Washington University.

**Defendant Phillips**

56.     Defendant Robert L. Phillips ("Phillips") served as a Company director from 2003 until he retired on May 13, 2020.

57.     For the fiscal year ended December 31, 2018, Defendant Phillips received $170,944 in compensation from the Company. This included $63,264 in fees earned or paid in cash and $107,680 in stock awards.

58.     The Company's 2019 Proxy Statement stated the following about Defendant Phillips:

> Mr. Phillips is a corporate director. He retired as President and CEO of the BCR Group of Companies in 2004. Prior to joining BCR, Mr. Phillips was Executive Vice President, Business Development and Strategy for MacMillan Bloedel Ltd. and previously held the positions of President and CEO at the PTI Group and Dreco Energy Services Ltd. Mr. Phillips currently serves as a director of the Canadian National Railway Corporation, Canadian Western Bank and West Fraser Timber Co., Ltd. Mr. Phillips has also enjoyed a prestigious law career and was appointed

Queen's Counsel in Alberta in 1991. Mr. Phillips has attained degrees in chemical engineering and law from the University of Alberta.

**Defendant Zahler**

59.     Defendant Eric J. Zahler ("Zahler") has served as a Company director since 2014. He also serves as the Chair of the Company's Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 19, 2020, Defendant Zahler beneficially owned 6,000 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $8.39, Defendant Zahler owned approximately $50,340 worth of Maxar stock.

60.     For the fiscal year ended December 31, 2018, Defendant Zahler received $125,760 in compensation from the Company. This included $10,080 in fees earned or paid in cash and $115,680 in stock awards.

61.     The Company's 2020 Proxy Statement stated the following about Defendant Zahler:

> Mr. Zahler is President and Chief Executive Officer of Monocle Acquisition Corp, having served in this role since August 2018, and previously served as Managing Director of Sagamore Capital Group LLC, a private equity firm pursuing investments in the aerospace/defense, industrial electronics and selected business service markets from 2008 to 2018. From February 2000 to November 2007, Mr. Zahler was President and Chief Operating Officer of Loral Space & Communications Inc., a global satellite communications services provider and a manufacturer of commercial satellites. From 1992 to 2000, Mr. Zahler held varying senior-level management positions at Loral and its predecessor companies. Mr. Zahler was an attorney at Fried, Frank, Harris, Shriver & Jacobson LLP for seventeen years and where he was elected Partner in 1983. Mr. Zahler holds a Bachelor of Science degree in mathematics from Yale University and a law degree from Harvard Law School.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

62.     By reason of their positions as officers, directors, and/or fiduciaries of Maxar and because of their ability to control the business and corporate affairs of Maxar, the Individual

16

Defendants owed Maxar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Maxar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Maxar and its shareholders so as to benefit all shareholders equally.

63.    Each director and officer of the Company owes to Maxar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

64.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Maxar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

65.    To discharge their duties, the officers and directors of Maxar were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

66.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Maxar, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company

has been ratified by the remaining Individual Defendants who collectively comprised Maxar's Board at all relevant times.

67.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

68.    To discharge their duties, the officers and directors of Maxar were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Maxar were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Colorado, and the United States, and pursuant to Maxar's own Code of Ethics and Business Conduct (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Maxar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Maxar and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Maxar's operations would comply with all applicable laws and Maxar's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

69.      Each of the Individual Defendants further owed to Maxar and the shareholders the duty of loyalty requiring that each favor Maxar's interest and that of its shareholders over their

own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

70.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Maxar and were at all times acting within the course and scope of such agency.

71.    Because of their advisory, executive, managerial, and directorial positions with Maxar, each of the Individual Defendants had access to adverse, non-public information about the Company.

72.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Maxar.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

73.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

74.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

75.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal

material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Maxar was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

76.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

77.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Maxar, and was at all times acting within the course and scope of such agency.

## **MAXAR'S CODE OF CONDUCT**

78.    Maxar's Code of Conduct provides that it "applies worldwide to all Board members, directors, officers, employees, contractors, agents and consultants ("Employees") of Maxar Technologies Inc. and its subsidiaries, affiliates, partnerships and ventures worldwide."

79.    In a section titled, "We Also Act with Integrity in All Business Dealings," the Code of Conduct states the following, in relevant part:

> At Maxar we frequently collaborate with our government and commercial business partners in various aspects of our operations. We earn their trust and business through the same hard work and integrity we apply to all our relationships and activities. We never seek to gain advantages through unfair, unethical or illegal business practices.

* * *

> As Maxar Employees, we may only make accurate and truthful statements when discussing our products or services in business-related conversations, advertising or other public communications. Please consult with the Legal Department if you have any questions concerning laws or regulations that might apply when marketing or discussing our products or services

80.     In a section titled, "Fair Competition and Antitrust Compliance," the Code of Conduct states that "[a]ll Employees are expected to fully comply with all applicable antitrust and competition laws. We will not tolerate unethical and manipulative practices to obtain or maintain business."

81.     In a section titled, "We Comply with Laws and Regulations," the Code of Conduct states the following, in relevant part:

> We are all responsible for our own conduct and for complying with the law and with this Code. Violations by even one individual can have significant impacts on the Company's ability to carry on its business, our reputation, and the hard work of our Employees.

82.     In a section titled, "Acceptable Use of Company Resources," the Code of Conduct states the following, in relevant part:

> Proper use of Company resources, including our physical assets, systems, and intellectual property, is critical to Company operations and reputational integrity. All Company assets are to be used for Company business only, although incidental personal use is permitted. As a general rule, Company resources are not to be used for any personal benefit or the personal benefit of anyone else.

83.     In a section titled, "We Will Keep Accurate Books, Records and Internal Controls," the Code of Conduct states the following:

> We keep accurate records of all financial and business transactions. Our record-keeping procedures are essential to ensure that all costs are properly charged. It is your responsibility to record all costs accurately and to follow all accounting procedures. No false or misleading entries should be made in our books and records. You must follow carefully our policies on document retention, including electronic documents and e-mails. Never destroy any documents that you believe might be relevant as evidence in any civil, criminal or regulatory proceedings. This could expose you and the Company to severe penalties.

Maxar has a detailed financial control structure and related procedures designed in accordance with securities regulations which require companies to implement and evaluate internal controls for purposes of financial statement reporting integrity. Assessing the quality of these internal controls involves a continuous process of evaluating their design and operation and taking necessary corrective action to improve them as required. Through discussions with managers and review of Maxar's documented practices and procedures, each employee must understand his or her role with regard to Maxar's overall control structure and related procedures. An employee should report as soon as possible to his or her manager or other appropriate person in accordance with Section VIII of this Code any potential concerns he or she may have with respect to either his or her own role or performance or otherwise relating to Maxar's control structure and related procedures. Early identification of problems is critical to the strength of the Company's controls, as well as maintaining compliance with the law.

84.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in improper accounting practices, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and aiding and abetting thereof. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

85.    Based in Westminster, Colorado, Maxar purports to be a "leading provider of solutions in Earth intelligence and space infrastructure." Through its subsidiaries, including SSL and DigitalGlobe, the Company produces and operates GeoComm satellites, and provides related communications solutions and infrastructure to its customers.

86.     All of the GeoComm satellite contracts procured by the Company are highly material to Maxar's business prospects, as each contract leads to hundreds of millions of dollars in revenue. However, the satellite manufacturing process is extremely capital-intensive, and accordingly there is a slim profit margin on such contracts. Thus, the Company's GeoComm business must receive a steady flow of orders in order to remain profitable.

87.     The Company purchased SSL in 2012 for over $1.1 billion, and most of the assets the Company received in connection with the acquisition related directly to the GeoComm business. In the following years, however, the Company began to experience a steady decline in its GeoComm business, largely due to the entry of cheaper, more flexible LEO satellites into the market during this period. For instance, SSL procured nine GeoComm contracts in 2014, but only five during 2015, and only four during 2016.

88.     In 2017, the Company's GeoComm segment enacted several mass layoffs due to the declining GeoComm market. For instance, In February 2017, the Company laid off 161 employees, and in June 2017, the Company laid off 173 employees at SSL along with 66 systems engineers.

89.     On August 8, 2017, Defendant Lance made certain gloomy statements to investors at the Jeffries Global Industrial Conference regarding the outlook for the GeoComm market, stating the following:

> But we're not counting on a huge rebound in the commercial communications market. Our growth is going to come from the remote sensing satellites we're going to build and from the U.S. government satellites. Now, if we get a rebound, we'll benefit from that, but I'm not counting on it. I think that we will see a recovery, but we're going to plan pretty conservatively
>
> . . . . But going forward, will that part of the business be a growth engine? I think remains to be seen.

90.    Near the end of 2017, the GeoComm market seemed to be approaching a structural collapse. As such, each of the Company's GeoComm contracts—including the AMOS-8 contract that the Company would announce at the start of the Relevant Period—were of critical importance to the Company and investors.

91.    In October 2017, the Company acquired DigitalGlobe in a $2.4 billion transaction. DigitalGlobe's primary satellite was WorldView-4, a high-precision imaging satellite. The satellite is oriented and stabilized by three control moment gyroscopes ("CMGs"), and any failure on the part of the CMGs may permanently inhibit the satellite's image capturing functionality—WorldView-4's sole revenue-generating function.

92.    The Company receives telemetry from WorldView-4 several times each day, including "TLE" data, which concerns the orbits of other artificial objects in orbit around the Earth. On or about October 12, 2018, WorldView-4's TLE data became suddenly erratic, indicating a loss of stability. The satellite's stability was never restored.

**Applicable Accounting Standards and the Individual Defendants' Duty to Disclose**

93.    Prior to the completion of the Company's domestication in the U.S. in January 2019, Maxar reported to securities regulators in both the U.S. and Canada. As such, during the Relevant Period, the Company prepared its financial statements in accordance with the International Financial Reporting Standards ("IFRS"), as promulgated by the International Accounting Standards Board ("IASB"). The Company's financial statements were also subject to certain of the International Accounting Standards ("IAS"), which were adopted by the IASB's predecessor entity, and which remain part of the IFRS.

94.    IAS 36, Impairment of Assets, states that a company's assets shall be "carried at no more than their recoverable amount." IAS 36.1. "An asset is carried at more than its recoverable

amount if its carrying amount ['book value'] exceeds the amount to be recovered through use or sale of the asset ['fair value']. If this is the case, the asset is described as impaired and the Standard requires the entity to recognise an impairment loss."

95.    IAS 36.8 provides that "[a]n asset is impaired when its carrying amount exceeds its recoverable amount." IAS 36.8. "An entity shall assess at the end of each reporting period whether there is any indication that an asset may be impaired." IAS 36.9. If an entity has reasons to believe that an impairment loss may have occurred, the entity "is required to make a formal estimate of recoverable amount."

96.    IAS 36.12 describes the following indications that an impairment loss may have occurred:

**External sources of information**

(a) there are observable indications that the asset's value has declined during the period significantly more than would be expected as a result of the passage of time or normal use.

(b) significant changes with an adverse effect on the entity have taken place during the period, or will take place in the near future, in the technological, market, economic or legal environment in which the entity operates or in the market to which an asset is dedicated.

* * *

**Internal sources of information**

(e) evidence is available of obsolescence or physical damage of an asset.

(f) significant changes with an adverse effect on the entity have taken place during the period, or are expected to take place in the near future, in the extent to which, or manner in which, an asset is used or is expected to be used. These changes include the asset becoming idle, plans to discontinue or restructure the operation to which an asset belongs, plans to dispose of an asset before the previously expected date, and reassessing the useful life of an asset as finite rather than indefinite.

(g) evidence is available from internal reporting that indicates that the economic performance of an asset is, or will be, worse than expected.

(Emphasis in original.)

97. IAS 36.14 also describes the following indicators based on internal reporting:

(a) cash flows for acquiring the asset, or subsequent cash needs for operating or maintaining it, that are significantly higher than those originally budgeted;

(b) actual net cash flows or operating profit or loss flowing from the asset that are significantly worse than those budgeted;

(c) a significant decline in budgeted net cash flows or operating profit, or a significant increase in budgeted loss, flowing from the asset; or

(d) operating losses or net cash outflows for the asset, when current period amounts are aggregated with budgeted amounts for the future.

98. IAS 36.22 provides that if an entity cannot estimate the recoverable amount of an individual asset, the entity should determine the recoverable amount "for the cash-generating unit ["CGU"] to which the assets belong." IAS 36.22. A CGU is "the smallest identifiable group of assets that generates cash inflows that are largely independent of the cash inflows from other assets and groups of assets." IAS 36.6.

99. With respect to a company's accounting of its inventories, IAS 2.6 and IAS 2.9 provide that the value of inventories "shall be measured at the lower of cost and net realisable value," where "net realisable value" is the "estimated selling price in the ordinary course of business less the estimated costs of completion and the estimated costs necessary to make the sale." "The cost of inventories shall comprise all costs of purchase, costs of conversion and other costs incurred in bringing the inventories to their present location and condition." IAS 2.10.

100. IAS 2.28 provides that "[t]he cost of inventories may not be recoverable if those inventories are damaged, if they have become wholly or partially obsolete, or if their selling prices have declined."

101.    IAS 2.30 further provides the following with respect to events occurring after the end of a given reporting period:

Estimates of net realisable value are based on the most reliable evidence available at the time the estimates are made, of the amount the inventories are expected to realise. These estimates take into consideration fluctuations of price or cost directly relating to events occurring after the end of the period to the extent that such events confirm conditions existing at the end of the period.

102.    IAS 10, *Events after the Reporting Period*, provides for "(a) when an entity should adjust its financial statements for events after the reporting period; and (b) the disclosures that an entity should give about the date when the financial statements were authorised for issue and about events after the reporting period."

103.    IAS 10.3 describes the types of relevant events that occur after a given reporting period as follows:

(a) those that provide evidence of conditions that existed at the end of the reporting period (adjusting events after the reporting period); and

(b) those that are indicative of conditions that arose after the reporting period (nonadjusting events after the reporting period).

104.    IAS 10.9 provides that evidence of impairments to assets or inventories may require that current period financial statements be adjusted, stating the following:

The following are examples of adjusting events after the reporting period that require an entity to adjust the amounts recognised in its financial statements, or to recognise items that were not previously recognised:

* * *

(b) the receipt of information after the reporting period indicating that an asset was impaired at the end of the reporting period, or that the amount of a previously recognised impairment loss for that asset needs to be adjusted. For example:

* * *

(ii) the sale of inventories after the reporting period may give evidence about their net realisable value at the end of the reporting period.

105.    Lastly, IAS 10.19 provides that "[i]f an entity receives information after the reporting period about conditions that existed at the end of the reporting period, it shall update disclosures that relate to those conditions, in the light of the new information."

106.    In the years leading up to the Relevant Period, the Individual Defendants were presented with a number of indicators of impairment to the Company's assets, including the Company's mass layoffs and the serious declines in the Company's GeoComm business, which were impacting the Company's other business segments as well. During an earnings call held on February 22, 2018, for instance, the Company's then-CFO, non-party William McCombe stated the following, in relevant part:

> Total company revenues declined 7% year-over-year in the quarter. Our Imagery business recorded strong revenue growth year-over-year; however, this was more than offset by declines in the Space Systems segment where the step-down in award values in the GEO ComSat market since 2015 continued to flow through as lower revenue in the current quarter together with a lower level of planned activity on the RCM project for the Canadian government.

* * *

> We expect total company pro forma year-over-year revenues to decline 2% to 4% in 2018, as compared to 2017, driven by declines in our Space Systems segment, in part offset by continuing solid growth in the Imagery and Services segments.

> Our Space Systems business continues to feel the impact of the stepdown in [GeoComm sat] award values that began in 2015. We have seen these award value stabilize at lower levels in the last couple of years, thus providing a backdrop for a potential stabilization of the segment's revenue streams in the coming years.

107.    During the Company's investor day held on March 8, 2018 Defendant Wirasekara purported that there were "very strong headwinds" in the GeoComm business, and stated that the 45% decline in the GeoComm market during the past two years impacted "a large segment" of the Company's business.

108.    Also during the March 8, 2018 investor day, Defendant Lance commented on the Company's layoffs, and admitted that the Company did not expect the GeoComm market to recover, stating the following:

> I don't know off the top of my head what the percentage is. Fixed costs have probably not come down linearly with revenue. Direct costs have. We've taken out, over the last 18 months, probably 450 people. We didn't want to do that, but obviously the volume wasn't there to support it. We have had step-function reductions in fixed costs, but I would say the next wave of that is what Dario and his team are looking at right now. Fixed costs tend to come out more like a stairstep, whereas direct labor can come out more linearly. But we were hopeful – [20/20] hindsight, which you'd always love to have, we were hopeful the market was going to rebound a little more. And I think it's only during the last 6 to 9 months that after doing a lot of external market study, we've concluded that the market is going to stay at this level, we think, or maybe slightly above it as some of these replacements come along. And so we were hesitant to go in and take out large chunks of fixed costs because if the volume goes up, you need those. But we've now made the decision to do that.

109.    Yet, despite these and other indicators, during the Relevant Period, the Individual Defendants endeavored to conceal the Company's waning prospects by declining to record impairment charges to the Company's assets and inventories as they were required to do pursuant to the IFRS. The Individual Defendants ultimately only recorded the necessary charges after being prompted to do so following the August 7, 2018 publication of the Spruce Point Report, which brought the Individual Defendants' improper accounting practices into the view of the public.

**<u>False and Misleading Statements</u>**

***March 26, 2018 Press Release and Social Media Posts***

110.    On March 26, 2018, the Company issued a press release announcing that the Company had been awarded a contract by Spacecom to construct the AMOS-8 satellite. The press release stated the following, in relevant part:

> PALO ALTO, CA and TEL AVIV, Israel, March 26, 2018 /PRNewswire/ - Spacecom (TASE: SCC), operator of the AMOS satellite fleet, today announced it has chosen SSL, a Maxar Technologies company (formerly MacDonald, Dettwiler and Associates Ltd.), (NYSE: MAXR; TSX: MAXR) to build its AMOS-8

advanced communications satellite. The satellite will deliver state-of-the-art broadcast, broadband and data services from Spacecom's 4°degrees West 'hot spot' to Europe, Africa and the Middle East.

AMOS-8 will include flexible high power Ku-band and Ka-bandpayloads with steerable antennas to enable customers to deliver various added value services. The satellite is designed to provide service for a minimum of 15 years, and is based on the world's most popular commercial communications satellite platform—the SSL 1300—which has the capability to support a broad range of advanced applications and technologies.

"SSL is dedicated to delivering advanced space systems and services that inform, entertain and connect people around the globe," said Dario Zamarian, group president of SSL. "SSL will demonstrate our industry-leading technological capabilities, our legacy of expertise and our commercial mindset to meet all of Spacecom's mission requirements. We are honored to be selected to manufacture this satellite, which will enable access for underserved people in Europe, Africa and the Middle East to high-speed, reliable data—a connection essential in today's digital world to understand what is happening across the planet and participate fully in the global community."

The AMOS-8 geostationary communications satellite will be co-located with AMOS-3. A contract option has been signed between Spacecom and SpaceX for AMOS-8's scheduled launch in the second half of 2020.

"AMOS-8 will bring additional high-quality capacity to expand our offerings and provide our partners with the abilities to add new and exciting services," said David Pollack, CEO and president of Spacecom. "Spacecom is dedicated to delivering reliable and cost-effective services that are enjoyed and relied upon by millions of people and businesses. We are eager to work together with SSL to develop this new satellite."

111.    That same day, SSL touted the contracts on its Facebook page, stating, "2018 is off to a great start for SSL with two contracts to build GEO satellites announced today. Thank you B-SAT and Spacecom for placing your trust in SSL!" SSL's public Twitter account also shared a journalist's tweet stating that "@sslmda gets two GEO satellite orders, both of which need to be in orbit in 2020. Those are tight deadlines, but SSL has hit them before."

112.    The above statements in ¶¶ 110–111 were false and misleading because they failed to disclose that the AMOS-8 contract was not effective until SSL received its first payment from

Spacecom under the contract, and Spacecom could still withdraw from the contract without penalty within 60 days. Moreover, Spacecom depended entirely on future bond offerings to fund its payments pursuant to the contract, which made it even more unlikely that the contract would become effective.

### April 30, 2018 Calcalist Article

113.    On April 30, 2018, *Calcalist* published an article on its website describing an announcement by the Israeli government that put the AMOS-8 contract in serious jeopardy. The article stated the following, in relevant part:[2]

> In a filing to the Tel Aviv Stock Exchange on Monday, Spacecom, also known as Space Communication Ltd., announced it has received a letter from a government official on Sunday, informing the company that the state intends to "work towards placing a satellite by Israel Aerospace Industries Ltd. (IAI)," a stateowned company, at the geostationary position intended for AMOS-8, which belongs to Israel.

> The announcement could mean that Israel plans to launch its own satellite through IAI, cutting Spacecom out of the loop. It may also mean Spacecom can find its way back into the deal if it commissions the satellite from IAI. In both scenarios, American Loral loses the contract.

### May 9, 2018 Earnings Call and Press Release

114.    On May 9, 2018, the Company held a conference call with investors and analysts to discuss its financial results for the fiscal quarter ended March 31, 2018. During the call, Defendant Lance stated the following, in relevant part:

> We were very pleased to report in the quarter that we were awarded 2 new GEO communications satellites.

> . . . Israeli satellite operator [Spacecom] selected SSL to build the AMOS-8 satellite. This will deliver state-of-the-art broadcast, broadband and data services from its 4-degree West hot spot to Europe, Africa, and the Middle East. AMOS-8 will include

---

[2] https://www.calcalistech.com/ctech/articles/0,7340,L-3737090,00.html (last visited September 16, 2020).

flexible, high-power Ku-band and Ka-band payloads, with steerable antennas to enable [Spacecom] to deliver a number of value-added services.

115.    Also on May 9, 2018, the Company issued a press release announcing the Company's financial results for the quarter, which was included as an exhibit to a Form 6-K filed with the SEC. The press release described the AMOS-8 contract as a "notable booking."

116.    The Company also issued a slide deck in connection with its quarterly financial results, which listed AMOS-8 as a "key accomplishment."

117.    The above statements in ¶¶ 114–116 were false and misleading because they failed to disclose that the AMOS-8 contract was not effective until SSL received its first payment from Spacecom under the contract, and Spacecom could still withdraw from the contract without penalty within 60 days. Moreover, Spacecom depended entirely on future bond offerings to fund its payments pursuant to the contract, which made it even more unlikely that the contract would become effective.

118.    During the conference call, with respect to the GeoComm market, Defendant Lance stated that Maxar expected 50% of the "nominal level of around 20 awards" in 2018 and that Maxar would look for ways to "align [its] costs longer-term with . . . a sustained, lower level of GEO market orders." Defendant Wirasekara also stated that the "continued weakness" in the GeoComm market "more than offset" the Company's revenue growth in other segments.

119.    The Company's May 9, 2018 press release also provided the Company's balance sheet for the quarter, which reported intangible assets of $1,698.2 million, PP&E of $1,066.4 million, inventories of $100.5 million, net earnings of $31 million, and net earnings per share of $0.55.

120.    The above statements in ¶¶ 118–119 were false and misleading because they failed to disclose the material impairments to the Company's GeoComm CGU. Specifically, to be in

compliance with IFRS standards, the Company should have accrued impairment charges of $37.7 million to inventories, $260.3 million to intangible assets (excluding goodwill), and $85.6 million to PP&E; consolidated inventories, intangibles, and PP&E of $62.8 million, $1.4 billion, and $980.9 million, respectively; and a net loss and basic loss per share of -$352.6 million and -$6.25, respectively, for the quarter.

### May and June 2018 AMOS-8 Articles

121.    During May and June 2018, a number of articles were published that cast doubt on the viability of the Company's AMOS-8 contract.

122.    First, on May 27, 2018, *Calcalist* published an article revealing that Spacecom had failed to make its initial payment to SSL pursuant to the AMOS-8 contract. Though Spacecom's nonpayment should have voided the deal, SSL agreed to extend the payment deadline by 30 days.

123.    On June 19, 2018, *Haaretz*, an Israeli newspaper, published an article quoting Israeli Defense Minister Avigdor Lieberman as stating, "[r]ight now it looks like we will buy a blue-and-white satellite A to Z, and not just for the sake of IAI."

124.    On June 25, 2018, *Calcalist* published another article revealing that Spacecom had again missed its payment deadline to SSL, and that SSL had extended Spacecom's payment deadline by another 60 days, to September 25, 2018.

125.    At some point between June 10, 2018 and June 29, 2018, the Individual Defendants inconspicuously removed the AMOS-8 contract from the listing of GeoComm contracts on the Company's website.

### July 31, 2018 Earnings Call and Press Release

126.    On July 31, 2018, the Company held a conference call with investors and analysts to discuss its financial results for the fiscal quarter ended June 30, 2018. During the call, Defendant

Lance stated the following regarding the Company's prospects and the future of the GeoComm market, in relevant part:

> We've already discussed the Telesat LEO award, which could be the first step in a multibillion-dollar production program for Maxar. So where does that leave the GEO Communications market? As we've discussed at length in the past, industry orders fell significantly in 2015 and have remained at those low levels ever since. At this point, we do not expect a significant recovery for this market, with industry orders likely to be at the low end of the 8 to 12 awards range this year 2018.

> From our perspective, industry growth clearly is moving in the direction of LEO and NEO [constellations], with the demand for GEO primarily driven by the replacement needs of existing satellites. As such, we are examining a range of strategic alternatives for our [GeoComm sat] line of business. We continue to align our workforce size with the operations and engineering work to be done. We continue to exit leased buildings and consolidate our footprint on the Palo Alto campus.

> * * *

> Yes. I don't think that our view has changed. I think the words we used and have used since March is that we expected a bottoming. And that's really referring to our revenue from this sector. So as we launch more satellites than we book, our revenues have been coming down quarter and quarter and quarter for some time. So the bottoming occurs when we essentially reach kind of a steady state from a revenue standpoint. And we believe that we're just about there.

> The orders this year, that the industry is now – that we're expecting for the industry is very much on par with last year. I think last year was about 7, we think it's going to be around 8 or so this year. And that results in a limited amount of bookings. And revenue continues to decline. So I don't think that our view of that has really changed since the March time frame. We continue to look at alternatives as we've discussed. And we will, in the near future, reach a conclusion with this business on how we go forward.

127.    Also during the call, Defendant Wirasekara stated that there had been "significant decline in the Space Systems business, impacted by a step down in award values" which "more than offset" the revenue growth in other segments, and that "Space Systems experienced a 3% year-over-year revenue decline in Q2 as growth in our U.S. Government and smallsat businesses were more than offset by the decline in the GEO Communication satellite business and our work on the Canadian RCM program that is nearing completion."

128.    Also on July 31, 2018, the Company issued a press release announcing the Company's financial results for the quarter, which was included as an exhibit to a Form 6-K filed with the SEC. The press release also provided the Company's balance sheet for the quarter, which reported intangible assets of $1,673.4 million, PP&E of $1,060.5 million, inventories of $95.3 million, net loss of $18.6 million, and net loss per share of $0.33.

129.    The above statements in ¶¶ 126–128 were false and misleading because they failed to disclose the material impairments to the Company's GeoComm CGU. Specifically, to be in compliance with IFRS standards, the Company should have accrued impairment charges $37.7 million to inventories, $260.3 million to intangible assets (excluding goodwill) and $85.6 million to PP&E; consolidated inventories, intangibles, and PP&E of $57.6 million, $1.4 billion and $975.0 million, respectively; and a net loss and basic loss per share of -$402.1 million and -$7.03, respectively, for the quarter.

**The Truth Gradually Emerges as False and Misleading Statements Continue**

*August 7, 2018 Spruce Point Report*

130.    On August 7, 2018, Spruce Point Capital Management published the Spruce Point Report, which stated, among other things, that "Maxar's balance sheet is inflated with goodwill and overcapitalized intangible assets. We expect it will write down the value of these inflated assets by at least $2.4 billion to fair value after its evaluation of strategic alternatives results in no means to maximize value." The report detailed certain of the impairments to the Company's intangible assets that should have been recorded, and further estimated that the Company's intangible assets were impaired by hundreds of millions of dollars.

131.    On this news, the price of the Company's stock sank by over 13%, falling from $44.41 per share at the close of trading on August 6, 2018, to $38.44 per share at the close of trading on August 7, 2018.

132.    Later that same day, on August 7, 2018, the Company issued a press release attempting to refute the allegations in the Spruce Point Report. The press release stated the following, in relevant part:

> The report on Maxar Technologies Ltd. ("Maxar" or the "Company", formerly MacDonald, Dettwiler and Associates Ltd.) (NYSE and TSX: MAXR) released today by Spruce Point Capital Management contains a number of inaccurate claims and misleading statements.Maxar believes it is a direct attempt by a short-seller to profit, at the expense of Maxar shareholders, by manipulating Maxar's stock price.

> Maxar continues to execute against its strategy, and recently reaffirmed its full year 2018 guidance for revenue and cash flow from operations, while increasing its full-year adjusted EPS outlook. Maxar believes that the Company remains positioned for future growth. Management and the Board of Directors are focused on delivering enhanced value for all Maxar shareholders.

> Maxar continues to be fully committed to transparency in all of its investor presentations and financial reports.

133.    The above statements in ¶ 132 were false and misleading because they failed to disclose that the Company's Audit Committee had in fact launched an investigation into the allegations in the Spruce Point Report, and in connection thereto the Company would ultimately record significant impairment charges relating to its GeoComm business.

134.    Despite the Individual Defendants' reassurances, the Company's share price continued to fall to $36.69 per share at the close of trading on August 8, 2018.

***August 24, 2018 Press Release***

135.    On August 24, 2018, the Company published a press release on PR Newswire providing a more in-depth commentary on the Spruce Point Report, and acknowledging the

37

"possible impairment" of certain of the Company's assets. The press release stated the following, in relevant part:

> WESTMINSTER, CO, Aug. 24, 2018 /PRNewswire/ - Maxar Technologies Ltd. (NYSE and TSX: MAXR) ("Maxar" or the "Company") has received a number of investor inquiries following the inaccurate statements and misleading conclusions included in a report from Spruce Point Capital Management, a hedge fund with a track record of launching negative campaigns against North American public companies after taking a short position in their stock.
>
> * * *
>
> In response to the accounting claims made in the report, the audit committee of the Board of Directors undertook a review of the elements of the Company's financial statements and disclosures associated with Spruce Point's claims and found no material errors in the previously issued financial statements and disclosures under IFRS. The audit committee takes seriously any claims regarding the Company's financial reporting. Specifically, the committee conducted a thorough and independent review that addressed claims made by the hedge fund's report prior to issuing this response. The audit committee conducted its review with the assistance of external advisors including its independent auditor, KPMG LLP, and independent third-party subject matter experts.
>
> * * *
>
> The Company is exploring strategic alternatives regarding the future of its GEO communications satellite line of business and has continuously implemented actions to right size the business to maximize near-term profitability. Mature demand for satellite-based video distribution, falling satellite-based broadband pricing, and alternative LEO and MEO technologies have negatively impacted the Company's GEO communications satellite line of business. The Company has discussed these market factors and has provided updated industry outlooks in each of the Company's recent quarterly filings, as well as in its quarterly investor calls and its Investor Days in March 2018. The SSL acquisition, and the reorganization as part of its U.S. Access Plan, has also allowed the Company to begin to compete on and win attractive U.S. government space systems and commercial LEO satellite contracts that are driving growth and creating value for shareholders.
>
> The Company's facilities in Palo Alto, CA are significantly over-sized for today's market and under-absorbed overhead costs have contributed to reduced profitability and negative cash flows in the Space Systems segment. The strategic alternatives under consideration include partnering with another satellite manufacturer to gain scale benefits, the sale of the GEO satellite line of business, or the exit of the GEO satellite line of business following completion of existing contracts in backlog and sale of its facilities. The monetization of the Company's real estate assets in Palo Alto are estimated to be in a range of $150 to $200 million. LEO small satellite

production for commercial communications, remote-sensing and U.S. Government customers is expected to be relocated to the Company's facility in San Jose, CA. A decision on the future strategic direction of the GEO communications satellite business is expected to be made by the end of 2018. As a result, this line of business may be classified as a discontinued operation.

The Company expects that under certain of these scenarios, non-cash write-downs or an impairment of assets could occur as a result of lower future revenue expectations, industry outlook and overall valuation of the GEO communications satellite line of business. The Company routinely evaluates assets for impairment in the fourth quarter of each year, and in interim quarters when there is an indicator of possible impairment. As part of its preparation of its financial statements for the third quarter of 2018, the Company will, consistent with IFRS rules, estimate the recoverable amount of the GEO communications satellite line of business assets, including goodwill, other intangible assets, capitalized development, and inventory, and will recognize an impairment or non-cash write-down if the recoverable value of the assets is determined to be less than their carrying value. We believe that, given the continued decline in the GEO communications satellite business, it is possible that an impairment or write-down will be recognized in the third quarter of 2018. However, our analysis is not complete and, accordingly, we are unable to estimate the amount of the possible impairment or write-down at this time.

In addition, cash costs for certain employee severance, pension and other liabilities could be incurred. We have already implemented a series of ongoing actions to right size the business in the near term to conserve cash. During the six months ended June 30, 2018, the Company incurred employee severance and enterprise improvement costs of $12.6 million.

136.    On this news, the price of the Company's stock fell by roughly 5.6% over the next two trading days, dropping from $35.92 per share at the close of trading on August 22, 2018, to $33.92 at the close of trading on August 24, 2018.

### *September 2018 AMOS-8 Contract Announcements*

137.    On September 3, 2018, the Israeli Ministry of Science and Technology announced that AMOS-8 would be constructed by an Israeli company, not SSL, and would be funded by the Israeli government. Ophir Akumis, Israel's Minister of Science and Technology stated the following:

"The decision has long-term strategic significance and meets the vital existential needs of the State of Israel. The development and production of the satellite in Israel

will enable the maintenance of complete independence in the field of satellite communications. Its construction in Israel will preserve knowledge and expertise in the field acquired over the decades in the local industry."

138.    On this news, the price of the Company's stock sunk by roughly 6%, falling from $31.05 per share at the close of trading on August 31, 2018, the prior trading day, to $29.34 per share at the close of trading on September 4, 2018.

139.    Then, on September 25, 2018, in a Hebrew-language report filed with the Tel Aviv Stock Exchange, Spacecom confirmed that it would not be making any down payment to SSL in connection with the AMOS-8 contract.

140.    On this news, the price of the Company's stock declined by nearly 5%, falling from $34.81 per share at the close of trading on September 25, 2018, to $33.18 per share at the close of trading on September 26, 2018.

### October 31, 2018 Press Release, Form 6-K Exhibit, and Earnings Call

141.    On October 31, the Company issued a press release announcing the Company's financial results for the fiscal quarter ended September 30, 2018, which was included as an exhibit to a Form 6-K filed with the SEC. The press release revealed an enormous $38.6 million impairment and inventory charges related to the Company's GeoComm business, stating the following:

"We recognized impairment losses of $345.9 million and an inventory obsolescence charge of $37.7 million related to the GEO Comsat business this quarter. This non- cash charge reflects the decline in the business and our decision to evaluate strategic alternatives for GEO Comsat."

* * *

The Company announced in Q1 2018 that Space Systems/Loral, LLC ("SSL"), a wholly owned subsidiary of Maxar, was selected by Spacecom to build its AMOS8 advanced communications satellite. In September 2018, this contract became void when the customer did not make the initial payment and it became evident that the Spacecom would not achieve financing on the project. The voiding of this contract

did not have an impact on the Company's backlog, as it was not a definitive award and was not included in backlog.

142.    The Company's Form 6-K filed that day also included as an exhibit Company management's "Discussion and Analysis" for the three and nine months ended September 30, 2018, which stated the following regarding the impairment charges:

> Non-financial assets are tested annually for impairment in the fourth quarter or whenever there is an indication that an asset may be impaired. Non-financial assets that do not generate independent cash flows are grouped together into a cash generating unit ("CGU"), which represent the level at which largely independent cash flows are generated. An impairment loss is recognized in earnings to the extent that the carrying value of an asset, CGU or group of CGUs exceeds its recoverable amount. Impairment is first evaluated by management at the CGU level, absent allocated goodwill.
>
> The Company considers whether any indicators of impairment exist each quarter. The GeoComm business, a CGU within the Space Systems segment, forecasted it would have a significantly different mix of programs at the beginning of the year. Additionally, the GeoComm business predicted it would be awarded approximately three to four contracts for geocomm satellites, or approximately thirty percent of the overall 2018 industry awards. During Q1 2018, the Company was awarded a contract to provide the B-SAT satellite, and it was also selected to build the AMOS8 satellite, a key program with the Israeli government. By the end of Q2 2018, the Company was still confident in its prediction of three to four geocomm satellite builds. For the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present.
>
> In the third quarter of 2018, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts. By August 2018, there were only five winnable programs across the industry for the entire year, and two to three other satellites from the total industry outlook of eight to twelve awards were delayed. In addition, in Q3 2018 it became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8. The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels. Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly oversized for today's business volume. As a result of these and other factors, the Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business for its current environment.

The aggregation of the above factors resulted in an impairment trigger being identified as at August 31, 2018 at the GeoComm CGU. The Company first performed an impairment test of the GeoComm CGU. The impairment test of the GeoComm CGU evaluated the non-financial assets held by the Company based on an asset group level, absent allocated goodwill. Assets were aggregated to the level in which independent cash flows could be generated for their respective groupings. The carrying values of these asset groups were compared against their fair value less costs of disposal for possible impairment and an impairment loss of $345.9 million related to property, plant and equipment and intangible assets was recorded for the three months ended September 30, 2018.

\* \* \*

The Company was previously holding inventory on hand in anticipation of awards to be won during the second half of 2018 and for the AMOS 8 program. The impacts from the loss of AMOS 8 and inability to obtain the forecasted awards culminated during the third quarter of 2018. These factors compelled the Company to re-evaluate its inventory reserves for inventory that was previously pegged to forecasted usage.

All GeoComm inventory subject to discernment over future use based on forecasts was assessed for possible obsolescence. The result of the re-assessment of future usage of the on-hand inventory was an incremental inventory obsolescence reserve of $37.7 million for the three months ended September 30, 2018.

143.    The Form 6-K further stated that "actual results [could] differ materially from current expectations [based on certain risks, including] loss of, or damage to, a satellite before the end of its expected operational life," while failing to disclose that the WorldView-4 satellite had already lost stability on or around October 12, 2018, and could therefore no longer produce usable high-quality imagery.

144.    Also on October 31, 2018, the Company held a conference call with investors and analysts to discuss its financial results for the quarter. During the call, Defendant Lance stated the following regarding the Company's GeoComm business:

Market trends at the U.S. and international government levels remain very positive, with growing budgets to fund increased space investments. The global threat environment is persistent, and that's driving higher spending levels in key areas that we can address. All of our business segments will benefit from the trends noted on this slide.

> The legacy GEO Comsat market, of course, is an exception, and it remains weak, with industry orders at the lowest level in recent history. The severity and persistence of this market downturn led us to announce the pursuit of strategic alternatives for the GEO product line at the end of July. We are in active discussions, continue to expect to announce a definitive direction for this business by the end of the year.

145.    Defendant Lance conceded that "for a few quarters [the Company was] now trending in GEO toward a loss," and stated that the "primary path remains to sell the business."

146.    Also during the call, the Company's new CFO, non-party Biggs Porter indicated that the Company's impairment and inventory charges were due in part to the declining market, and directly attributed the charges to the Company's losses for the quarter, stating the following:

> IFRS EPS was a loss of $7.31 versus a gain of $0.34 in the third quarter of 2017, driven largely by the $384 million in noncash impairment inventory obsolescence charges related to the GEO Comsat business. As Howard mentioned earlier, the current state of this market, together with other factors, necessitated an analysis of the carrying value of the GEO Comsat assets on our balance sheet. This led to an impairment loss of $346 million related to property, plant and equipment and intangible assets and an inventory obsolescence reserve of $38 million during this quarter.

> On an IFRS basis, we posted a loss of $7.29 year-to-date versus a gain of $0.98 in 2017. Again, the major driver of the decline was the impairment and inventory charges I mentioned earlier.

147.    On this news, the price of the Company's stock plummeted by nearly 45% on heavy trading volume, falling from $27.07 per share at the close of trading on October 30, 2018, to $14.91 per share at the close of trading on October 31, 2018

***November 6, 2018 Conference Call***

148.    On November 6, 2018, the Company held a call to announce the extension of a satellite contract with the government. During the call, Defendant Lance discussed the Company's WorldView-4 satellite as follows:

There will be opportunities for us to negotiate and agree to pricing for additional capacity in the future, either from Worldview-4 or WorldView Legion once that constellation is on orbit.

* * *

As I indicated Audrey, we think there are multiple opportunities over time with the NRO to increase contract, either current contract or have additional contracts related to things like adding RADARSAT-2 imagery, adding additional capacity either from WorldView-4 today or from WorldView Legion, recognizing the increased revisit we're going to be providing, finding more ways to provide analytics, and so on.

149.    The statements in ¶ 148 were false and misleading because they failed to disclose that the WorldView-4 satellite had lost stability on or around October 12, 2018, and could therefore no longer produce usable high-quality imagery.

### November 28, 2018 Credit Suisse Annual Industrials Conference

150.    On November 28, 2018, Defendant Lance attended the Credit Suisse Annual Industrials Conference. During the conference, Defendant Lance presented slides to attendees stating that "[o]pportunity for additional capacity to be supplied in the future from WorldView-4 and WorldView Legion" and that WorldView-4 was engaged in "on-orbit" operations, which would continue until 2027.

151.    The statements in ¶ 150 were false and misleading because they failed to disclose that the WorldView-4 satellite had lost stability on or around October 12, 2018, and could therefore no longer produce usable high-quality imagery.

### The Truth Fully Emerges

152.    In December 2018, the Company announced that it had sold off a $70 million Palo Alto property used to house SSL engineers in order to pay down certain of the Company's debt. Several weeks later, the Company announced that it had entered into amendments to certain of its

credit agreements in order to increase the total amount the Company could borrow in proportion to its earnings.

153.    Then, on January 7, 2019, the Company at last issued a press release on PR Newswire disclosing that the Worldview satellite had "experienced a failure in its control moment gyros ("CMGs"), preventing the satellite from collecting imagery due to the loss of an axis of stability." The press release stated the following, in relevant part:

> WESTMINSTER, CO, Jan. 7, 2019 /PRNewswire/ - Maxar Technologies Inc. (NYSE:MAXR) (TSX:MAXR) ("Maxar" or the "Company"), a global technology innovator powering the new space economy, today reported that its WorldView-4 satellite experienced a failure in its control moment gyros ("CMGs"), preventing the satellite from collecting imagery due to the loss of an axis of stability.
>
> Efforts are ongoing in conjunction with its suppliers in an attempt to restore satellite functionality, but thus far these efforts have been unsuccessful. At this time, Maxar believes that WorldView-4 will likely not be recoverable and will no longer produce usable imagery. Maxar operations has put the WorldView-4 satellite in a safe configuration and will continue to monitor the satellite's location and health. The satellite was built by Lockheed Martin and the CMGs were provided by Honeywell.

154.    On this news, the price of the Company's stock plunged by nearly 31%, falling from $11.72 per share at the close of trading on January 4, 2019, the prior trading day, to $8.03 per share at the close of trading on January 7, 2019. The Company's stock price continued to fall by roughly 25% over the course of the next trading day, sinking to $6.03 per share at the close of trading on January 8, 2019.

155.    Shortly thereafter, on January 14, 2019, Defendant Lance resigned as the Company's President and CEO, due to "the company's performance in 2018 and the loss of over 90% of our value in the marketplace."

156.    On February 28, 2019, the Company reported an impairment charge of $883 million due to the "decline in [Maxar's] market value" and "the continuation of a weak GEO Comsat

market." This charge included a $162 million writedown for the loss of the Company's WorldView-4 satellite, a $636 million impairment to goodwill, and $85 million in net impairment losses related to GeoComm assets.

157.    On March 28, 2019, the Company filed its 2019 Proxy Statement, which revealed that the Company had identified material weaknesses in its financial reporting processes, stating the following:

> During 2018, management documented its internal controls and completed its testing and evaluation of internal control over financial reporting. The Audit Committee met regularly with management and the independent auditor, KPMG U.S., to discuss the progress of the evaluation. Based on the Company's internal review, management identified material weaknesses in the Company's internal control over financial reporting as of December 31, 2018 related to an insufficient complement of trained resources, ineffective continuous risk assessment, and ineffective control activities related to percentage-of-completion revenue and cost of sales, measurement and disclosure of income taxes, and commitment and contingency disclosures have been identified and included in management's assessment.

158.    Also during March 2019, the Company's Chief Accounting Officer, non-party Jose A. Torres, Jr., resigned from his position with the Company.

159.    In June 2019, news outlets reported that the Company was exploring the sale of its MDA subsidiary in the hopes of raising $1 billion to pay down the Company's long-term debts.

## DAMAGES TO MAXAR

160.    As a direct and proximate result of the Individual Defendants' conduct, Maxar will lose and expend many millions of dollars.

161.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its former CEO, and its former interim CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

162.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

163.     As a direct and proximate result of the Individual Defendants' conduct, Maxar has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

164.     Plaintiff brings this action derivatively and for the benefit of Maxar to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Maxar, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, as well as the aiding and abetting thereof.

165.     Maxar is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

166.     Plaintiff is, and has been at all relevant times, a shareholder of Maxar.  Plaintiff will adequately and fairly represent the interests of Maxar in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

167.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

168.    A pre-suit demand on the Board of Maxar is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following ten individuals: Defendants Jablonsky, Cyprus, Estes, Isham, Kehler, Mason, and Zahler (the "Director-Defendants"), along with non-parties Roxanne Decyk, Gilman Louie, and Eddy Zervigon (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time of the filing of this complaint.

169.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to engage in improper accounting practices and to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

170.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to engage in improper accounting practices and in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

171.    Additional reasons that demand on Defendant Jablonsky is futile follow.  Defendant Jablonsky has served as the Company's President and CEO since January 13, 2019. He previously served as the President of DigitalGlobe following its October 2017 acquisition by the Company,

until he was appointed as the Company's President and CEO in January 2019. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Jablonsky with his principal occupation, and he receives handsome compensation, including $3,954,024 during 2019 for his services. As a trusted Company officer, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Jablonsky was the President of DigitalGlobe during the Relevant Period, and accordingly, he would have been fully aware of the importance of WorldView-4's TLE data, yet, he caused the Company to conceal the fact that WorldView-4 had lost stability and would be unable to produce usable high-quality images. For these reasons, Defendant Jablonsky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172.    Additional reasons that demand on Defendant Cyprus is futile follow. Defendant Cyprus has served as a Company director since 2017. He also serves as the Chair of the Company's Audit and Finance Committee, and as a member of the Risk Committee. Defendant Cyprus has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Cyprus formerly served as a director of DigitalGlobe, and he would have been fully aware of the importance of WorldView-4's TLE data, yet, he caused the Company to conceal the fact that

WorldView-4 had lost stability and would be unable to produce usable high-quality images. For these reasons, Defendant Cyprus breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Estes is futile follow. Defendant Estes has served as a Company director since 2017, and as the Chairman of the Board since 2019. Defendant Estes has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Estes formerly served as a director of DigitalGlobe, and he would have been fully aware of the importance of WorldView-4's TLE data, yet, he caused the Company to conceal the fact that WorldView-4 had lost stability and would be unable to produce usable high-quality images. For these reasons, Defendant Estes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Isham is futile follow. Defendant Isham has served as a Company director since 2016. She also serves as a member of the Company's Compensation Committee and Risk Committee. Defendant Isham has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her

duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Isham breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Kehler is futile follow. Defendant Kehler has served as a Company director since 2016. He also serves as the Chair of the Company's Risk Committee, and as a member of the Compensation Committee. Defendant Kehler has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Kehler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Mason is futile follow. Defendant Mason has served as a Company director since 2017. He also serves as a member of the Company's Audit and Finance Committee and Nominating and Corporate Governance Committee. Defendant Mason has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Mason formerly served as a director of DigitalGlobe, and he would have been fully

aware of the importance of WorldView-4's TLE data, yet, he caused the Company to conceal the fact that WorldView-4 had lost stability and would be unable to produce usable high-quality images. For these reasons, Defendant Mason breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.   Additional reasons that demand on Defendant Zahler is futile follow. Defendant Zahler has served as a Company director since 2014. He also serves as the Chair of the Company's Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. Defendant Zahler has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Zahler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.   Additional reasons that demand on the Board is futile follow.

179.   Defendants Cyprus and Mason (the "Audit Committee Defendants") served as members of the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the performance of the Company's internal audit function, and the Company's compliance with applicable laws and regulations. The Audit Committee Defendants failed to ensure the integrity of

the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in improper accounting practices, to file false and misleading financial statements with the SEC, and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

180.    Defendants Cyprus, Isham, and Kehler (the "Risk Committee Defendants") served as members of the Company's Risk Committee during the Relevant Period. Pursuant to the Company's Risk Committee Charter, the Risk Committee Defendants are responsible for overseeing, among other things, the material risks facing the Company and its business, as well as the Company's strategy for assessing, monitoring, and mitigating such risks. The Risk Committee Defendants failed to properly monitor the Company's risk management framework, allowing the Company to engage in improper accounting practices and to file the false and misleading statements described herein, which resulted in extensive damage to the Company. Thus, the Risk Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

181.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Cyprus, Estes, and Mason each served as directors of DigitalGlobe prior to its October 2017 acquisition by the Company, with Defendant Jablonsky having served as DigitalGlobe's Senior Vice President, General Counsel, and Corporate Secretary from March 2012 until October 2017. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's

operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

182.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to engage in improper accounting practices, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.  In violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto.  Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

183.    Maxar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Maxar any part of the damages Maxar suffered and will continue to suffer thereby.  Thus, any demand upon the Director-Defendants would be futile.

184.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this

action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

185.    The acts complained of herein constitute violations of fiduciary duties owed by Maxar's officers and directors, and these acts are incapable of ratification.

186.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Maxar.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves or certain of the officers of Maxar, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore, excused.

187.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Maxar to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

188.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Lance and Wirasekara for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    Maxar, along with Defendants Lance and Wirasekara are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Lance and Wirasekara's willful and/or reckless violations of their obligations as officers and/or directors of Maxar.

191.    Defendants Lance and Wirasekara, because of their positions of control and authority as officers and/or directors of Maxar, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Maxar, including the wrongful acts complained of herein and in the Securities Class Action.

192.    Accordingly, Defendants Lance and Wirasekara are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

193.    As such, Maxar is entitled to receive all appropriate contribution or indemnification from Defendants Lance and Wirasekara.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

194.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Maxar's business and affairs.

196.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

197.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Maxar.

198.    In breach of their fiduciary duties owed to Maxar, the Individual Defendants willfully or recklessly caused the Company to engage in improper accounting practices, and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Individual Defendants improperly inflated the value of the Company's intangible assets related to the Company's GeoComm business, and omitted material impairments; (2) the Company's AMOS-8 contract with Spacecom was largely illusory, and would predictably fall through; (3) the Company's WorldView-4 satellite had become permanently unstable, and accordingly the satellite could no longer produce usable high-quality images; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

199.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

200.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

201.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Maxar's securities.

202.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Maxar's securities.

203.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

204.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Maxar has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

205.    Plaintiff on behalf of Maxar has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Maxar.

208.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Maxar that was tied to the performance or artificially inflated valuation of Maxar, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

209.    Plaintiff, as a shareholder and a representative of Maxar, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

210.    Plaintiff on behalf of Maxar has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

211.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Maxar, for which they are legally responsible.

213.     As a direct and proximate result of the Individual Defendants' abuse of control, Maxar has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Maxar has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.     Plaintiff on behalf of Maxar has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

215.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Maxar in a manner consistent with the operations of a publicly-held corporation.

217.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Maxar has sustained and will continue to sustain significant damages.

218.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

219.     Plaintiff on behalf of Maxar has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

220.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

222.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

223.    Plaintiff on behalf of Maxar has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Maxar, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Maxar;

(c)    Determining and awarding to Maxar the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Maxar and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Maxar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop

and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Maxar to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Maxar restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

Dated: September 18, 2020                  Respectfully submitted,

                                           **FARNAN LLP**

Of Counsel:

                                           /s/ Michael J. Farnan
THE BROWN LAW FIRM, P.C.                    Brian E. Farnan (Bar No. 4089)
Timothy Brown                              Michael J. Farnan (Bar No. 5165)
240 Townsend Square                        919 N. Market St., 12th Floor
Oyster Bay, NY 11771                       Wilmington, DE 19801
Telephone: (516) 922-5427                  Telephone: (302) 777-0300
Facsimile: (516) 344-6204                  Facsimile: (302) 777-0301
Email: tbrown@thebrownlawfirm.net          bfarnan@farnanlaw.com
                                           mfarnan@farnanlaw.com

                                           *Attorneys for Plaintiff*